UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X

MORGAN AYCOX,                                          Civil Action No:18-cv-9109


                        Plaintiff,
                                                       **COMPLAINT**

        -against-


GLOBAL GLIMPSE,



                        Defendant.
---------------------------------------------------------------------X

PLAINTIFF MORGAN AYCOX (hereinafter "Plaintiff" or "Ms. Aycox"), by her attorneys, Nesenoff and Miltenberg, LLP, whose offices are located at 363 Seventh Avenue, 5th Floor, New York, New York 10001, as and for her Complaint alleges, upon knowledge with respect to herself, and upon knowledge, information and belief as to all other matters, as follows:

## INTRODUCTION

1.      Plaintiff brings this action against Defendant Global Glimpse (hereinafter "Defendant") to redress Defendant's unlawful discrimination and retaliation against Plaintiff based on her race and lawful complaints of racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) *et seq.* (hereinafter "Title VII"), 42 U.S.C. § 1981, the New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.*, (hereinafter the "NYSHRL"), and the New York City Human Rights Law, N.Y. City Admin. C. §§ 8-101, *et seq.*, (hereinafter the "NYCHRL"), together with any other cause(s) of action which can be reasonably inferred from the facts as set forth herein.

1

## JURISDICTION AND VENUE

2.       This Court has subject matter jurisdiction in this case under 28 U.S.C. § 1331.

3.       This Court may assert supplemental jurisdiction over Plaintiff's state law claims pursuant to 29 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form a part of the same case or controversy between Plaintiff and Defendant.

4.       Venue is proper within this judicial district, specifically the Southern District of New York pursuant to 28 U.S.C. § 1391 because all or a substantial part of the events and/or omissions giving rise to the claims herein occurred in New York County which is located in the Southern District of New York.

## PARTIES

5.       Plaintiff is an African-American woman who is a resident and domiciliary of Chicago, Illinois.

6.       At all times relevant to the Complaint, Plaintiff was an individual and an "employee" of Defendant within the meaning of all applicable Federal, State, and local laws.

7.       Upon information and belief, Defendant is a registered 501(c)(3) corporation, organized and existing under the laws of the State of California and is authorized to do business in the State of New York.

8.       Upon information and belief, Defendant maintains an office in New York City at 55 Exchange Place, Suite 503, New York, New York 10005. Upon information and belief, Defendant's principal place of business is located at 2991 Shattuck, Suite 304, Berkeley, California 94705.

9.       At all times relevant to the Complaint, Defendant was Plaintiff's "employer" with the meaning of all applicable Federal, State, and local laws.

## CONDITIONS PRECEDENT

10.     Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about April 27, 2017.

11.     On July 18, 2018, Plaintiff received a Notice of Right to Sue from the EEOC. This action is being commenced within ninety (90) days of Plaintiff's receipt of her Notice of Right to Sue.

## FACTUAL ALLEGATIONS

### Defendant Hires Ms. Aycox to Serve as Its Director of Outreach

12.     In or around July of 2015, Ms. Aycox, who has a Master's degree in clinical counseling psychology, applied for and received an offer letter from Defendant for the position of "Director of Outreach" in Defendant's Chicago, Illinois office.

13.     In the offer letter, Defendant described itself as being "committed to serving youth from diverse socioeconomic backgrounds."

14.     Ms. Aycox's job was, essentially, to recruit high schools to participate in Defendant's program.

15.     Defendant agreed to provide Ms. Aycox with a base starting salary of $65,000.00 annually.

16.     Ms. Aycox accepted the position because she very much believes in supporting diversity amongst young people.

17.     Ms. Aycox thereafter began her employment with Defendant in September of 2015.

18.     Despite its alleged commitment to diversity, Ms. Aycox learned that she was only the second African-American employee to be hired by Defendant. Indeed, upon information and belief, out of approximately fifty (50) employees, only she and one other employee, Fawziah Qadir ("Ms. Qadir"), were African-American.

19.     Upon information and belief, only two African-American people have *ever* been employed by Defendant.

20.     Upon information and belief, Ms. Aycox and Ms. Qadir were two of the most highly educated employees at Defendant.

21.     Upon information and belief, upon hiring Ms. Aycox, Defendant reported to Ms. Qadir that now she would no longer be the "token black person."

**Defendant Segregates Its Clients Based Upon Their Respective Races**

22.     Defendant classified its potential school clients into three groups: "upper income high schools," "middle income high schools," and "low income high schools." Ms. Aycox quickly came to learn that "middle-income" and "upper-income" high schools referred to high schools with an overwhelmingly, predominately Caucasian student population, and that Defendant's use of the term "low-income" high schools meant high schools with a predominately Africa- American or Hispanic student population.

23.     Ms. Aycox began working for Defendant and was disappointed to learn that Defendant was far more committed to its relationships with "middle-income" and "upper-income" high schools populated by Caucasian students than the so-called "low-income" schools that were predominantly populated by students of minority backgrounds.

24.     Ms. Aycox was focused on fulfilling what Defendant represented to her to be its mission, namely, building a diverse group of students to experience international culture together.

25.     To that end, she sought to partner "low-income" high schools with "upper-income" high schools to take joint trips abroad together, and made sure to also focus on building relationships with the "low-income" high schools that were largely populated by minority students.

26.    Defendant was openly exasperated by Ms. Aycox's efforts to develop and maintain relationships with "low income" high schools, and repeatedly told her to focus her efforts on the "upper income", predominantly Caucasian populated, high schools.

27.    Defendant and Defendant's founder and executive director, Eliza Pesuit ("Ms. Pesuit"), repeatedly made it clear to Ms. Aycox that Plaintiff should not "bother with" "low income" high schools. In fact, Defendant offered its employees a $1,000.00 incentive bonus for each relationship they secured with "upper income" high schools. The same incentive was not offered for securing relationships with "low-income" high schools.

28.    Ms. Aycox repeatedly objected to Defendant's refusal to include "low income" high schools, because the "low income" high schools provided diversity to the program.

**Defendant Displays Rampant Cultural Insensitivity**

29.    On the rare occasion when Defendant did bother to interact with the "low income", minority populated high schools, Ms. Aycox was shocked by Defendant's ignorant and offensive communication, including constant, and, shockingly tone-deaf references to "urban populations."

30.    Though the minority parents were obviously offended and even outraged by Defendant's casual use of such offensive terms, Ms. Pesuit and most of Defendant's employees seemed woefully unaware.  Even when Ms. Aycox pointed out that their presentation was offensive, Defendant dismissed her concerns.

31.    Ms. Aycox was also outraged by comparisons between the so-called "Chicago Black kids" and the "New York Black kids," terms commonly and openly used by Defendant to describe alleged differences in the students' behavior. Ms. Aycox again tried to point out the issue with this sort of talk to no avail.

32.    Ms. Aycox expressed additional concern that she was being marginalized by her Caucasian counterpart, who seemed to think that she was Ms. Aycox's superior, and who regularly bossed her around.

33.    Ms. Aycox and Ms. Qadir discussed the cultural issues at Defendant amongst each other. Further, Ms. Qadir specifically spoke up about the issues to Defendant and suggested that some diversity training would be helpful to Defendant in relation to inter-office issues as well as with the student clients.

34.    In addition, Ms. Aycox met with a diversity trainer and attempted to facilitate a meeting between he diversity trainer and Ms. Pesuit to discuss how diversity training would benefit Defendant but Ms. Pesuit refused to attend.

**Ms. Qadir is Placed on a Performance Improvement Plan and
Subsequently Terminated Under Suspicious Circumstances**

35.    Ms. Aycox was shocked to learn that, following her decision to express her concerns about diversity issues at the organization, Ms. Qadir was inexplicably placed on a performance improvement plan ("PIP") that seemed to have no basis in fact.

36.    In December of 2015, Ms. Aycox again found herself stunned when Ms. Qadir was terminated following her criticism of Defendant's lack of diversity, diversity training, and discrimination issues.  Ms. Aycox was especially shocked because the termination also followed a serious health issue that Ms. Qadir had recently reported.

**Ms. Aycox is Punished for Questioning the Decision
To Terminate Ms. Qadir and Whether it Was Racially Motivated**

37.    In January of 2016, Ms. Pesuit visited the Chicago office.  Ms. Aycox took the opportunity to express her grave concerns about the timing of Ms. Qadir's termination.

38.    Ms. Aycox specifically expressed to Ms. Pesuit that she did not understand how or why Ms. Qadir could have been terminated when she was performing more effectively than other

people who were not terminated. She further stated that both the timing and the trajectory of Ms. Qadir's discipline and termination were troubling, and she was concerned that it had something to do with Ms. Qadir's race.

39.    Ms. Aycox expressed further concern and wanted to make sure that "as an African-American, [she] did not end up in the same situation."

40.    Ms. Pesuit became incredibly tense and snapped, "what do you mean 'as an African-American?!'"

41.    Ms. Aycox responded that she (meaning Ms. Qadir) had complained about diversity issues and discrimination and that complaining about those issues seemed to cause her to be "disliked" by Defendant, to be put on a PIP, and to ultimately be terminated when she reported a serious illness.

42.    Ms. Aycox further stated that she was concerned that she would be subjected to the same kind of bizarre treatment as the other African-American employee had been if she continued to raise issues about the diversity and cultural problems within the organization, or if she suffered an illness.

43.    Ms. Aycox reiterated her belief that the organization very much needed diversity training and that, as a person of color, she was afraid that she would be let go for complaining about same.

44.    Ms. Aycox also mentioned the fact that Ms. Qadir had been diagnosed with a serious medical condition. Defendant denied that Ms. Qadir's illness had impacted her employment at all.

45.    Ms. Pesuit repeatedly dismissed Ms. Aycox's concerns and told her that Ms. Qadir was absolutely let go for performance reasons, not for complaining or for being ill.

46.    Ms. Aycox told her that the explanation did not make sense, since Ms. Qadir had just been promoted, had been doing an excellent job, and was more educated and qualified than most other employees at Defendant.

47.    Ms. Pesuit made clear that she resented being asked about her reasons for terminating Ms. Qadir.  She further stated that Ms. Qadir did not "hit her numbers," but she was unable to explain what numbers Ms. Qadir was supposed to hit.

48.    Shockingly, Ms. Pesuit then became extremely upset and began to cry.  She told Ms. Aycox that it was "really hard" to be the CEO and to make the hard decisions that CEO's are forced to make.

49.    Ms. Pesuit also made it clear to Ms. Aycox that she was offended by Ms. Aycox's questions about Ms. Qadir's termination.

50.    Ms. Aycox reminded Ms. Pesuit that, as Ms. Qadir had repeatedly said, there were serious race-based issues at Defendant that needed to be dealt with.  She specifically reminded her that Ms. Aycox's own Caucasian counterpart regularly behaved as if she were Plaintiff's boss.

51.    Ms. Aycox also pointed to the lack of diversity on the staff, and the critical need for Defendant's employees to undergo diversity training, especially if they were going to promote themselves as providing education to others on diversity, including the students and schools they served.

52.    Ms. Aycox also reiterated her feelings that it was important that Defendant had a relationship with minority schools, not just the "upper income", mostly Caucasian schools that Defendant wanted to focus on, if they hoped to achieve diversity.

53.    Ms. Pesuit petulantly explained to Ms. Aycox that she obviously didn't understand the "financials" of the organization, and that if she did, she would never bother trying to advocate for the "low income" schools.

54.     Thereafter, Ms. Pesuit abruptly changed her tone and became far more upbeat and positive. She ended the conversation by telling Ms. Aycox that she was proud of her and appreciated her courage in pointing out all of the issues with the organization. She told Ms. Aycox to continue to be a trailblazer and a creative thinker. Ms. Pesuit told Ms. Aycox that Defendant had hired her for exactly those reasons-because she believed that she would help get Defendant to the next level.

55.     Ms. Aycox was thrilled to hear that her efforts to promote diversity would be appreciated going forward and though her conversation with Ms. Pesuit had been tense and alarming on some levels, it appeared that Ms. Pesuit was committed to working on Defendant's issues moving forward.

**Ms. Aycox Submits a Diversity Proposal, but Realizes She Has Been Frozen Out**

56.     Reinvigorated by Ms. Pesuit's instruction to be a trailblazer, Ms. Aycox submitted a proposal by which the organization would engage equally with "upper income", Caucasian high schools and "low income", minority populated high schools.

57.     Upon information and belief, Defendant's Board of Directors supported Defendant's ideas.

58.     A week later, the proposal was angrily rejected and Ms. Aycox was warned to focus only on the "upper income", Caucasian populated high schools.

**Defendant Bizarrely Denies Ms. Aycox an Annual Review**

59.     In or around February of 2016, Ms. Aycox was told that Defendant was "too busy" to give her an annual review.

60.     Soon thereafter, Ms. Aycox was told that she was not "hitting her goals," and was assigned a new goal of ten "upper income" schools and no "middle" or "low income" schools. Even when Ms. Aycox presented a partner program involving a "high" and "low income" school that she

9

was able to introduce into the program, she was reprimanded and told that Defendant was not interested.

**Ms. Pesuit Largely Ignores Ms. Aycox**

61.    Thereafter, Ms. Pesuit generally started to avoid and ignore Ms. Aycox.  Bizarrely, however, she did call her on one occasion to advise her that she was "struggling" as a white woman working with "black people," leaving Ms. Aycox dumbfounded.

**Defendant Deems Ms. Aycox an "HR challenge"**

62.    Thereafter, Ms. Aycox became aware of an email conversation, Subject Line - "Re: HR Challenge," in which Ms. Pesuit sought EEO advice from the "perspective" of an African-American female board member (the "May 6, 2016 Email").  The May 6, 2016 Email was posted to an open, company-wide exchange server, which any employee could easily access.

63.    In the May 6, 2016 Email, Ms. Pesuit stated that she was "working through challenges" with Ms. Aycox, which just happened to be similar to "challenges" previously encountered with Ms. Qadir.

64.    Ms. Pesuit also stated in the May 6, 2016 Email that, "[g]iven both are African-American women and [Ms. Aycox] is now the only black staff member in the US, I am very aware of the delicacy of these challenges and want to understand your perspectives."

65.    In a reply email, Ms. Pesuit was advised,

> With respect to the perspective of another African-American female, I am not sure that this situation warrants any 'different' approach than any other individual if the dynamics are the same as with Fawziah. Fawziah was terminated based on lack of performance and therefore if Morgan's (Ms. Aycox's) issues are the same – *race (irregardless of the ratio) should not factor into the discussion or decision.* In the event that we as GG feel that the lack of diversity is impacting the organization and or its employees, then that is a separate discussion which I am absolutely open and willing to engage in.

10

66.     Twelve days later, yet again, Ms. Pesuit sent another email outlining a "strategy" based on the advice she received, which, upon information and belief, was designed to quiet Ms. Aycox in a seemingly non-discriminatory manner.

67.     In the email, Ms. Pesuit proposed,

> May 18th: Share high level thinking on this with Morgan and Eleanor so that they have context on organizational level challenge.
>
> May 20th: Incorporate feedback from Jenn & Kendra, *develop written documentation*.
>
> May 23rd: Share written documentation of strategy, goals, metrics and resource allocation with Morgan & Eleanor
>
> May 26th: Full team meeting to launch org communication monthly cadence and share current successes & challenges heading into the summer. *Use this to set the tone.*
>
> May 25th: Develop a strategy for NYC UI strategy meeting – Ben & Eliza with input from Jenn & Kendra
>
> June 6th: Eleanor and *Morgan decide if they are in or out*
>
> June 16-17 or June 20-21: Strategy Meeting in NYC – Morgan, Eleanor, Ben, Eliza, Jenn, Kendra

## Defendant Alters Ms. Aycox's Position and Offers Her an Ultimatum

68.     Pursuant to the outlined strategy, Defendant advised Ms. Aycox on May 19, 2016, that she would no longer be receiving a bonus and asked her to let them know if she still intended to stay on via email.

69.     Immediately after Ms. Aycox stated that she was going to stay, Defendant placed her on a PIP and began tormenting her at work.

70.     Specifically, amongst other nasty behavior, Ms. Pesuit advised Ms. Aycox that she was a "black cloud" on the organization, glared at her anytime she tried to speak and generally made her feel completely unwelcome.

## Ms. Aycox is Hospitalized Due to Work-Related Stress

71.    Following her placement on the PIP, Ms. Aycox began to experience high levels of stress, and physical manifestations thereof, because of the adverse, altered treatment she received at work.  On or about June 27, 2016, Ms. Aycox was hospitalized and it was determined that her symptoms were stress related.

72.    Though Defendant was aware of the stress diagnosis, they continued to mistreat Ms. Aycox. In turn, Ms. Aycox's stress symptoms only continued to worsen.

73.    At the end of July of 2015, Ms. Aycox decided that she could not continue putting up with the abuse and she reported to a supervisor that she felt that she was being racially discriminated against.  The response was an incredulous, "Why would you feel like that?"  Ms. Aycox insisted on discussing the matter, and she was told that it could be discussed "later."

74.    On August 4, 2016, Ms. Aycox sent a follow-up email asking when they were going to discuss her accusations of racism and discrimination.

75.    On or about August 5, 2016, Defendant terminated Plaintiff's employment.  Upon information and belief, Ms. Aycox was terminated in retaliation for her complaints of racism and discrimination.

76.    Upon information and belief, defendant has not hired another African-American employee within the United States since Ms. Aycox's termination

## CAUSES OF ACTION
## AS AND FOR A FIRST CAUSE OF ACTION
*(Race Discrimination in violation of Title VII)*

77.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "76" as if fully set forth herein.

78.    Plaintiff is an African-American female and is, therefore, a member of a protected class under 42 U.S.C. §§ 2000 et seq.

79.    Plaintiff was and is qualified to work as an employee for Defendant and she satisfactorily performed the duties required by all positions she held with Defendant.

80.    As set forth in detail above, Defendant subjected Plaintiff to disparate treatment and an atmosphere of adverse employment actions and decisions because of her race.

81.    As set forth in detail above and herein, Defendant subjected Plaintiff to a hostile work environment on the basis of her race.

82.    The race discrimination that Plaintiff suffered while employed at Defendant severely affected the terms and conditions of her employment, as set forth in detail here and above.

83.    By reason of Defendant's violations of Plaintiff's rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

84.    As a direct and proximate result of said unlawful employment practices, Plaintiff has suffered the indignity of discrimination, the invasion of her rights to be free from discrimination, and great humiliation, which has manifested in serious emotional stress and physical illness.

85.    As a further direct and proximate result of Defendant's unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself, harm to her future employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, health and the loss of enjoyment of the ordinary pleasures of everyday life.

86.    Based on the foregoing, Defendant discriminated against Plaintiff on the basis of her race in violation of Title VII.

87.    As a result of Defendant Global Glimpse's violations of Title VII, Plaintiff has been damaged in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
*(Race Discrimination in violation of the NYSHRL and NYCHRL)*

88.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "87" as if fully set forth herein.

89.     Plaintiff is an African-American female and is, therefore, a member of a protected class under the NYSHRL and the NYCHRL.

90.     Plaintiff was and is qualified to work as an employee for Defendant and she satisfactorily performed the duties required by all positions she held with Defendant.

91.     As set forth in detail above, Defendant subjected Plaintiff to disparate treatment and an atmosphere of adverse employment actions and decisions because of her race.

92.     As set forth in detail above and herein, Defendant subjected Plaintiff to a hostile work environment on the basis of her race.

93.     The race discrimination that Plaintiff suffered while employed at Defendant severely affected the terms and conditions of her employment, as set forth in detail here and above.

94.     By reason of Defendant's violations of Plaintiff's rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

95.     As a direct and proximate result of said unlawful employment practices, Plaintiff has suffered the indignity of discrimination, the invasion of her rights to be free from discrimination, and great humiliation, which has manifested in serious emotional stress and physical illness.

96.     As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, health, and the loss of enjoyment of the ordinary pleasures of everyday life.

97.    Based on the foregoing, Defendant discriminated against Plaintiff on the basis of her race in violation of the NYSHRL and the NYCHRL.

98.    As a result of Defendant's violations of the NYSHRL and the NYCHRL, Plaintiff has been damaged in an amount to be determined at trial.

<u>**AS AND FOR A THIRD CAUSE OF ACTION**</u>
*(Race discrimination in Violation of 42 U.S.C. § 1981)*

99.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "98" as if set forth herein.

100.    Plaintiff is an African-American female and is, therefore, a member of a protected class.

101.    Plaintiff was and is qualified to work as an employee for Defendant and she satisfactorily performed the duties required by all positions she held with Defendant.

102.    As set forth in detail above and herein, Defendant intentionally, willfully, and maliciously subjected Plaintiff to a hostile work environment and disparate treatment on the basis of her race.

103.    The race discrimination that Plaintiff suffered while employed at Defendant severely affected the terms and conditions of her employment, as set forth in detail here and above.

104.    By reason of Defendant Global Glimpse's violations of Plaintiff's rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

105.    As a direct and proximate result of said unlawful employment practices, Plaintiff has suffered the indignity of discrimination, the invasion of her rights to be free from discrimination, and great humiliation, which has manifested in serious emotional stress and physical illness.

106.    As a further direct and proximate result of Defendant Global Glimpse's unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself, harm to her

15

future employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, health, and the loss of enjoyment of the ordinary pleasures of everyday life.

107.   Based on the foregoing, Defendant discriminated against Plaintiff on the basis of Plaintiff's race in violation of 42 U.S.C. § 1981.

108.   As a result of Defendant's violations of 42 U.S.C. § 1981, Plaintiff has been damaged in an amount to be determined at trial.

### AS AND FOR A FOURTH CAUSE OF ACTION
*(Retaliation in violation of Title VII)*

109.   Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "108" as if set forth herein.

110.   As set forth in detail above, Defendant subjected Plaintiff to discrimination, a hostile work environment, and an atmosphere of adverse employment actions and decisions on the basis of her race.

111.   Plaintiff complained to Defendant regarding the discrimination she witnessed and experienced during her employment.

112.   In response to Plaintiff's complaints, Defendant subjected Plaintiff to a series of adverse employment actions including, but not limited to a worsening hostile work environment and an unlawful termination.

113.   As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff lost substantial income and benefits associated with his employment.

114.   As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself, harm to her employability and earning capacity, painful embarrassment

16

among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, health, and the loss of enjoyment of the ordinary pleasures of everyday life.

115. Based on the foregoing, Defendant retaliated against Plaintiff in violation of Title VII.

116. As a result of Defendant's violations of Title VII, Plaintiff has been damaged in an amount to be determined at trial.

## AS AND FOR A FIFTH CAUSE OF ACTION
*(Retaliation in violation of 42 U.S.C. § 1981)*

117. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "116" as if set forth herein.

118. As set forth in detail above, Defendant subjected Plaintiff to discrimination, a hostile work environment, and an atmosphere of adverse employment actions and decisions because of her race.

119. Plaintiff complained to Defendant regarding the discrimination she witnessed and experienced during her employment.

120. In response to Plaintiff's complaints, Defendant subjected Plaintiff to a series of adverse employment actions including, but not limited to a worsening hostile work environment and an unlawful termination.

121. As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff lost substantial income and benefits associated with his employment.

122. As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself, harm to her employability and earning capacity, painful embarrassment

among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, health, and the loss of enjoyment of the ordinary pleasures of everyday life.

123. Based on the foregoing, Defendant retaliated against Plaintiff in violation of 42 U.S.C. § 1981.

124. As a result of Defendant's violations of 42 U.S.C. § 1981, Plaintiff has been damaged in an amount to be determined at trial.

## AS AND FOR A SIXTH CAUSE OF ACTION
*(Retaliation in violation of the NYSHRL and the NYCHRL)*

125. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "124" as if set forth herein.

126. As set forth in detail above, Defendant subjected Plaintiff to discrimination, a hostile work environment, and an atmosphere of adverse employment actions and decisions because of her race.

127. Plaintiff complained to Defendant regarding the discrimination she witnessed and experienced during her employment.

128. In response to Plaintiff's complaints, Defendant subjected Plaintiff to a series of adverse employment actions including, but not limited to a worsening hostile work environment and an unlawful termination.

129. As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff lost substantial income and benefits associated with his employment.

130. As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself, harm to her employability and earning capacity, painful embarrassment

among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, health, and the loss of enjoyment of the ordinary pleasures of everyday life.

131.   Based on the foregoing, Defendant retaliated against Plaintiff in violation of the NYSHRL and the NYCHRL.

132.   As a result of Defendant's violations of the NYSHRL and the NYCHRL, Plaintiff has been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

a.    A judgment declaring that the practices complained of herein are unlawful and in violation of the aforementioned Federal, New York State, and New York City laws;

b.    Preliminary and permanent injunctions against Defendant and its officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with it, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

c.    An order restraining Defendant from any retaliation against Plaintiff for participation in any form in this litigation;

d.    All compensatory damages that Plaintiff has sustained as a result of the Defendant's unlawful discriminatory and retaliatory conduct, including back pay, front pay, damages to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment, emotional distress damages, general and special damages for lost compensation and employee benefits that she would have received but for the Defendant's conduct, and any other out-of-pocket losses that Plaintiff has incurred or will incur;

e.    Awarding Plaintiff her costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs;

f.    Pre-judgment and post-judgment interest, as provided by law; and

g.      Any other and further relief as this Court finds just, necessary and proper.


**Dated: New York, New York**
        **October 4, 2017**


                            **NESENOFF & MILTENBERG, LLP**
                            *Attorneys for Plaintiff*


                        **By:**    **/s/ Megan Goddard**
                                    **Megan S. Goddard, Esq.**
                                    **Gabrielle M. Vinci, Esq.**
                                    **363 Seventh Avenue, Fifth Floor**
                                    **New York, New York 10001**
                                    **(212) 736-4500**